## Wytheville.

### KELLY v. FAIRMOUNT LAND COMPANY.

#### JUNE 29, 1899.

1. PURCHASER — *Notice—Enquiry—Concealment—Estoppel—Case in Judgment—Unrecorded Deed of Trust.*—If a purchaser has knowledge of any fact or circumstance sufficient to put him upon enquiry as to the existence of some right or title in conflict with that which he is about to purchase, and makes the enquiry suggested by such fact or circumstances, and anything detrimental to the right he is about to acquire is concealed or withheld from him, he cannot afterwards be charged with notice of it, or be affected by an undisclosed encumbrance or latent equity. In the case in judgment the vendor of real estate who had not conveyed the legal title, also held an unrecorded deed of trust from his vendee on the same land for money advanced to him. Upon enquiry by a proposed purchaser as to what was necessary for the vendee to do to acquire title he disclosed the balance of purchase money due but said nothing about the unrecorded deed of trust. Under these circumstances the vendor is estopped to assert his deed of trust against the purchaser from the vendee.

Appeal from a decree of the Law and Equity Court of the city of Richmond, pronounced November 3, 1897, in a suit in chancery, wherein the appellant was the complainant, and the appellees were the defendants.

*Reversed.*

The Fairmount Land Company being the owner of land near the city of Richmond, which it desired to place upon the market, divided it up into lots and employed one S. P. Clay to

do certain grading for it, at an agreed price per yard, to be paid for by the conveyance to Clay of certain designated lots at a stipulated price. The company conveyed the lots to Clay, but retained the deed in its possession. Clay began the grading and, after completing about two-thirds of it, failed, and made an assignment. Kelly had recovered judgment against Clay for a large amount, which judgment had been duly docketed. Kelly applied to the Fairmount Land Company to know what was necessary to be done, or how much had to be paid to perfect the title in Clay and secure a deed to the lots. He was informed what Clay's contract was and how much he owed. He thereupon employed Clay to complete the grading at the price of about $1,200, and the grading was done accordingly. Before the grading was completed, however, the Fairmount Company put to record the deed it had made to the lots and also a deed of trust which Clay had given to it for other money due by Clay before the date of Kelly's judgment. There is serious conflict of evidence as to whether Kelly had notice of this deed of trust at the date of his purchase, but this court took the view that he did not. Kelly took the lots in satisfaction of his judgment and marked the judgment satisfied. The present suit was brought by Kelly to enjoin the sale of the lots under the deed of trust given by Clay, to remove the cloud cast on the title to the lots by reason of said deed of trust, and to quiet Kelly in the enjoyment of the same. The other facts appear in the opinion of the court.

*A. W. Patterson,* for the appellant.

*Jackson Guy* and *Geo. Bryan,* for the appellees.

RIELY, J., delivered the opinion of the court.

For the purposes of this decision, it may be conceded, as claimed by counsel for the appellee, that the money secured by

the deed of trust which is the subject of this controversy, together with the work of grading undertaken by Clay, constituted the purchase price for the lots which the Fairmount Land Company contracted to convey to him; from which it follows that Kelly, although he has completed the grading, cannot demand a clear title to the lots until the deed of trust has been satisfied, unless the company is estopped to claim the benefit of it.

Clay not having obtained a deed to the lots at the time Kelly was considering the propriety of accepting them, along with other lots in the city of Richmond, in satisfaction of his judgment against Clay, Kelly was put upon inquiry as to the state of Clay's right to the lots. It was incumbent upon him to ascertain from the Land Company what was necessary to be done or paid in order to obtain a clear title. If he omitted to make due inquiry, he could only acquire the lots subject to any encumbrance or burden upon them in favor of the company.

Recognizing this obligation, the counsel of Kelly applied to the company for information as to the state of Clay's right to the lots, and was informed by its secretary and general manager that Clay had not completed the payment for the lots, but that there was about fourteen hundred dollars' worth of grading still to be done before the lots would be fully paid for. The contract between the company and Clay with respect to the purchase of the lots, and the payment therefor in grading was shown to the counsel, at his request, and examined by him, but the deed of trust was not shown to him, nor was he then told of it.

The secretary deposed that he discussed the deed of trust on divers occasions with the counsel, but could not recollect whether it was before or after Kelly had accepted the conveyance of the lots. It is made very clear, however, by the testimony of the counsel that he first learned about the deed of trust from the secretary, but that the latter did not inform him of its existence until several months after Kelly had agreed to accept the Fairmount lots and the Richmond lots in satisfaction of his judgment,

received and recorded the conveyance, and marked his judgment satisfied.

It was further testified by the secretary, on his direct examination, that Kelly, before consummating the transaction as to the lots, talked with him about the state of Clay's right to them, and that they conversed about the deed of trust, of the existence of which Kelly seemed to be fully informed. Kelly denied positively that the deed of trust was mentioned or that he had any knowledge of it, and deposed that he first learned from his counsel, and with much surprise, of its existence. The testimony of the secretary upon this point is greatly impaired by the statement made on his cross-examination, when being pressed as to the knowledge of Kelly as to the deed of trust, that "Kelly may not have known of the existence of this trust deed." His testimony shows that knowledge of the deed of trust imputed by him to Kelly was rather an inference by the secretary from the fact that Kelly told him that Clay had promised to repay out of money he was getting from the company an amount Kelly had lent to Clay. It does not appear, however, that Kelly knew, or that the secretary informed him, upon what terms, or upon what security if any the company was letting Clay have money.

Clay testified that Kelly was aware of the deed of trust, but it is apparent, upon considering his whole testimony, that he made no distinction between a knowledge by Kelly of a simple indebtedness of Clay to the company, and a loan to him by it secured by a deed of trust on the lots. His testimony is entitled to very little weight in the effort to fasten upon Kelly actual notice of the deed of trust, and all mention of it to him by Clay was denied by Kelly.

Mr. Bryant, to whom Clay, on his failure, made an assignment, was informed of the deed of trust, and testified that he went into a calculation with Kelly when the latter was considering the question whether he would accept the lots in Fairmount and Richmond in satisfaction of his judgment against Clay, to

ascertain the value of Clay's interest in the property, there be-
ing a number of liens on the Richmond lots, and was positive
that the Fairmount property was embraced in the calculation,
and that the amount of grading still to be done, and the deed of
trust, were both considered. Kelly, in his testimony, admitted
that he understood from Bryant that the Fairmount Land Com-
pany had *some* claim against Clay, but never understood him to
say anything about a deed of trust. The whole negotiation with
Bryant, in regard to the acceptance of the lots by Kelly in dis-
charge of his judgment against Clay, was conducted by Collins
as counsel for Kelly, and the latter testified that he acquainted
his counsel fully with all the information he possessed in regard
to the matter. Collins was positive that Kelly never mentioned
to him the deed of trust, and that when he learned from the
secretary of the company of its existence and informed Kelly of
it, the latter was greatly surprised. Collins also testified that in
all his negotiations as counsel for Kelly with Bryant in regard
to the lots, the latter never mentioned to him the deed of trust.
Nor did Bryant testify that he did so.

While it was the duty of Kelly, as Clay had no recorded title
to the lots, to inquire of the Land Company what was necessary
to be done or paid in order to obtain a clear title, or he would
take them at his peril, it was no less the duty of the company,
when inquired of, to make a full and frank disclosure. Honesty
and fair dealing required that this be done. When Collins, as
counsel for Kelly, asked to see the contract between the com-
pany and Clay in regard to the lots, and it was shown to him
by the secretary, and he inquired what was the balance of work
to be done in order to complete the contract on the part of Clay,
the deed of trust not being a part of the original agreement, nor
referred to in the contract, it was plainly the duty of the com-
pany, through its secretary, to inform him of it. Where a pur-
chaser has knowledge of any fact or circumstance sufficient to
put him upon inquiry as to the existence of some right or title,

in conflict with that which he is about to purchase, and makes the inquiry suggested by such fact or circumstance, and anything detrimental to the right he is about to acquire is concealed or withheld from him, he cannot afterwards be charged with notice of it, or be affected by an undisclosed encumbrance or latent equity. 2 Devlin on Deeds, sec. 745; and *Massie* v. *Greenhow*, 2 P. & H. 255.

In the case at bar due inquiry appears to have been made, but the evidence is far from satisfactory that the unrecorded deed of trust, the existence of which should have been frankly disclosed, was made known to Kelly or his counsel, or that either of them knew of it. Upon a consideration of all the testimony, our conclusion is to the contrary. The effect of want of notice of the deed of trust was to mislead Kelly and his counsel. It induced him to accept property in discharge of his debt, which he testified that he would not have thought of doing under any circumstances, if he had known of the deed of trust, and which his counsel testified no less positively that he could have never thought of advising. If the company were now allowed to enforce the deed of trust, then Kelly accepted property for valuable consideration, which is wholly without value to him. Under the circumstances shown by the testimony, it would be inequitable to allow the deed of trust to be enforced. The loss must be borne by the company, to whose conduct and omission of duty it is due.

The lots in Fairmount, though valued at $4,160 when Clay contracted with the Land Company for them, were worth when Kelly took them, according to the great preponderance of the testimony, scarcely over, if at all, half that amount; so that although Kelly completed the grading for $1,200, the cost of the lots would greatly exceed their value, if, in addition to the completion of the grading, he had also to discharge the deed of trust for $1,855. In such case, the interest of Clay in the lots was of no value whatever, and there could have been no possible

inducement to Kelly to accept them in payment of his judgment. The testimony shows that their market value was particularly inquired into by the counsel of Kelly before advising his client to consummate the transaction, and it is inconceivable that with the knowledge he had acquired as to the value of the lots he could have advised Kelly to take them, or that Kelly would have accepted them along with the lots in Richmond in discharge of his judgment.

The decree appealed from must be reversed, and this court will enter such decree as the lower court ought to have entered.

*Reversed.*